**FILED**

**MAY 2 2 2013**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

IN THE MATTER OF THE SEARCH OF:

**1 Old Orchard Lane, Glen Carbon, Illinois, 62034, more particularly described as a townhouse duplex located on the south side Of the duplex, with brown brick, tan siding and a brown shingle roof, an attached two car garage that faces west, and a green mailbox with number 1 located at the end of the driveway.**

MISC. NO. 13-mj-3037-DGW

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, John Taylor, being first duly sworn, hereby depose and state:

I am a Special Agent (SA) with the Department of Homeland Security (DHS), and have

reason to believe that located on the premises known as:

**1 Old Orchard Lane, Glen Carbon, Illinois, 62034, more particularly described as a townhouse duplex located on the south side of the duplex, with brown brick, tan siding, a brown shingle roof, an attached two car garage that faces west, and a green mailbox with number 1 located at the end of the driveway**

and which residence is located in Madison County, within the Southern District of Illinois, there

is now concealed certain property:

## SEE ATTACHED LIST ENTITLED "ATTACHMENT A"

which constitutes  evidence of the commission of a criminal offense or which is contraband, the

fruits of crime, or things otherwise criminally possessed, or which is designed or intended for use

or which is or has been used as the means of committing an offense: all in violation of Title 18,

United States Code, Section 2251, 2252 and 2252A, specifically evidence related to the

production, advertisement, receipt, distribution, possession or accessing with the intent to view

images of minors engaged in sexually explicit activity.  The facts to support the issuance of a search warrant are as follows:

**AFFIDAVIT**

1.  I am a Special Agent (SA) with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge in St. Louis, Missouri.  I have been in Federal Law Enforcement for over 10 years.  I have investigated matters involving the exploitation of children, particularly in relation to violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, which criminalize the production, possession, receipt, distribution and transmission of child pornography.  I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of visual depictions of minors engaged in sexually explicit behavior in all forms of media including computer media.  I have personally participated in over 100 investigations involving the sexual exploitation of children.  I have also personally participated in the execution of search warrants, many of which involved child sexual exploitation offenses.  This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2.  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.  This Affidavit is submitted in support of an Application for Search Warrant authorizing a search of the residence located at **1 Old Orchard Lane, Glen Carbon, Illinois, 62034, more particularly described as a townhouse duplex located on the south side of the duplex, with brown brick, tan siding, a brown shingle roof, an attached two car garage that**

**faces west, and a green mailbox with number 1 located at the end of the driveway,** hereinafter referred to as the "SUBJECT PREMISES," which is located in the **Southern District of Illinois**. The purpose of this application is to seize and search evidence, more particularly described in Attachment A, incorporated herein by reference, as evidence, fruits, and instrumentalities of criminal activity.

4. I have probable cause to believe that evidence, fruits, and instrumentalities of violations of the production, advertisement, receipt, distribution, possession, and accessing with intent to view visual depictions of minors engaged in sexually explicit conduct are located within the SUBJECT PREMISES.   I am requesting authority to search the entire SUBJECT PREMISES, including the residential dwelling and any computers and other digital media located therein where the items specified in Attachment A may be found, and to seize all items listed in Attachment A as instrumentalities, fruits and evidence of criminal activity.

5. The statements contained in this affidavit are based upon my personal observations, training and experience, and review of relevant records related to this investigation, as well as information provided to me by other law enforcement officers involved in this investigation. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the production, advertisement, receipt, distribution, possession, and accessing with intent to view visual depictions of minors engaged in sexually explicit conduct are present in the SUBJECT PREMISES. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

3

6. The instant investigation, described more fully below, involves an Internet-based bulletin board, hereinafter referred to as "Bulletin Board A" or the "Board."[1] The primary purpose of "Bulletin Board A" is to facilitate the advertisement and distribution of child pornography, to include images and videos of infants and prepubescent minors engaged in sexually explicit conduct.

## DEFINITIONS RELATED TO THIS SEARCH WARRANT

7. The following definitions apply to this Affidavit:

    a. "Bulletin board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make posting themselves. Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards."

    b. "Child erotica," as used herein, means any material relating to minors that serves a sexual purpose for a given individual, including fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, and images or videos of minors that are not sexually explicit.

    c. "Child pornography," as used herein, is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from,

---

[1] For purposes of the confidentiality and integrity of the investigations involved in this matter, specific names and other identifying factors have been replaced with generic terms.

that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

e. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, mobile telephones, video gaming devices, portable electronic music players, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

f. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

5

g. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

h. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

i. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

j. The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web

hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

l. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet or they can be static, meaning that the ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

m. "Preview image" refers to an image or a set of images that is a representative sample of a larger collection of images or video(s). Preview images are commonly used to advertise the content of materials that are available at another internet location.

n. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides,

7

negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

o. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. *See* 18 U.S.C. § 2256(2).

p. A "vidcap," also known as a "storyboard," is a digital image created through a process where frames of a video are captured at set intervals and placed into a single image to give a visual overview of what is contained in the video. A link is then provided to an external upload site where the video is kept.

q. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

r. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up

Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

8. Computers and digital technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

9. The development of computers and digital cameras has changed this. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

10. Individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store over 100

9

gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

11. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

12. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte (1000 gigabytes) external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and

then copy it (or any other files on the computer) to any one of those media storage devices. (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them.)

13. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

14. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

15. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, *e.g.*, traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

11

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

16. Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

   a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

   b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

12

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

17. Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

13

a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

## **PROBABLE CAUSE**

### **DESCRIPTION OF "BULLETIN BOARD A"**

18. The primary purpose of "Bulletin Board A" is the sexual exploitation of minors, chiefly prepubescent minors, via advertising and distributing visual depictions of minors engaged in sexually explicit conduct, perpetrated by members who voluntarily and intentionally join the

14

Board. The Board was started in November of 2011 and remains active to date. As of February 2013, it has over 22,000 members worldwide. Images and videos available on the Board predominately depict minors engaging in sexually explicit conduct, though some non-nude child erotica-type images and videos are available. In total, dozens if not hundreds of gigabytes of child pornography images and videos are hosted on or linked from the Board. Board content includes the following categories of materials, and there are no categories depicting exclusively adults:

    a.  infants (less than one year old) being orally or digitally penetrated and sometimes engaged in bondage;

    b.  "LS" or "Lolita Studios," *i.e.*, commercially filmed/produced and branded content depicting minor females ranging in age from 8 to 14 who are completely nude or in various states of undress and/or wearing lingerie;

    c.  images/videos of minors lasciviously displaying their genitalia;

    d.  images/videos of minors engaging in sexual acts with other minors and/or adults; and

    e.  hidden camera content depicting minors changing clothes, sitting on a toilet, etc., which content lasciviously displays their genitalia;

19. When first accessing the Board, even before registering as a member of the Board, an individual sees a banner that depicts a visual depiction of a minor engaged in sexually explicit conduct as well as the name of the Board. This banner, which law enforcement has seen on the Board since November of 2011, is visible on every page of the Board. The visual depiction of a minor engaged in sexually explicit conduct on the banner depicts a prepubescent minor female lying on her stomach and looking back at the camera. Her legs are spread so as to display and focus on her vaginal area. This visual depiction of a minor engaged in sexually explicit conduct and its mirror image are on the right and left side of the banner.

20. Information that is provided and is accessible even before registering as a member of the Board include the categories depicted under the "Rules" section of the Board: "Attention," "accepted," "Video For sale," "DONATE," "Please, read the important notice," "HOW TO ATTACH PHOTOS," and "Welcome." Some of the topics in these categories give access to child pornography even if the user has not registered as a member of the Board. Becoming a member, however, provides an individual with access to additional child pornography images and videos.

21. In order to become a member of the Board, an individual must create a username, password, and provide an e-mail address. There is no validation for this registration process and the e-mail account does not have to be a valid e-mail. Once an individual is signed in as a member, the member becomes able to fully access the four sections of the "free" area of the Board: (1) Rules, (2) Dialogue and Discussion, (3) Photos, and (4) Videos, each of which is described in more detail, below. Members can post messages in the Board's various categories of these sections, upload and download content, and reply to messages posted by other members. The combination of an original posting and all replies to it is referred to as a message thread. Postings include the date and time of the post and a member's avatar, if any. The Board also has private messaging capability.

22. Upon becoming a member of the Board, there are a number of different pieces of information that members can obtain regarding other members. This information includes the other member's user identification number, date joined, and date last visited. By clicking on the "Members" tab the list of members can be sorted alphabetically and/or searched directly by member name. Provided that a member has not restricted the viewing of his e-mail, the

member's e-mail address can be identified. When viewing the member's profile, the total number of posts, most active forum, and most active topic can be observed. By clicking on the "search user's posts" button, a list of all threads the member has posted to will be displayed. These posts may be comments, links, actual images, or any combination of the three. As of February 8, 2013, there were approximately 1,123 topics with over 5,716 posts. While many of these are comment posts, they are in relation to the content posts. The content posts include embedded image files, vidcaps, and links to external file host sites. In most cases the file that is stored on the external host site is encrypted and the password is provided on the Board. Some members use the same passwords for multiple posts and others use a unique password for each post. Most, if not all, of the link files are encrypted files and the password is shared on the Board within the post containing the link(s).

23. There is significant discussion on the Board about avoiding law enforcement detection, not only in terms of removing identifying information from visual depictions of minors engaged in sexually explicit conduct produced by Board members, but also regarding how to protect and encrypt a member's collection of visual depictions of minors engaged in sexually explicit conduct in the event of a law enforcement search of a member's premises. For example, members discuss whether and how to remove background items, alter images, strip metadata, etc., from visual depictions of minors engaged in sexually explicit conduct produced by members of the Board. A review of Board postings shows that some members heed this advice while others do not. Board members also discuss and advise each other about encryption software that is available in order to hide and/or password-protect collections of visual depictions of minors engaged in sexually explicit conduct to prevent law enforcement from accessing such materials during a search.

17

24. PHOTOS Section. In the Photos section of the Board are posted numerous links to child pornography images. As of February 8, 2013, there were 350 topic postings and 2,067 posts in the Photos section. Embedded preview images can be opened in a new tab. If a file is encrypted, the poster will generally provide the password in the link, though sometimes the poster will post the password in a subsequent post on the same thread. Some posters use the same password for all of their encrypted files. Typically the .rar file, or container,[2] will include all of the images provided in the post and possibly many more images. Usually, if the link contains more files, the thread will state that it is a sample or that the link contains more images.

25. VIDEOS Section. In the Videos section of the Board are posted numerous links to child pornography videos. As of February 9, 2013, there were 573 topic postings and 2,693 posts. Therefore, the video posts are the heaviest volume of content on the Board in terms of the number of topic postings, despite the fact that video files are much larger than photo files.

26. VIP-PRIVATE Area. The Board Administrator has offered to provide access to the VIP area to members who uploaded 15 links to child pornography images or videos over the course of one month, or to members who donated money to the Administrator through anonymous prepaid card services. In the VIP-private section, the Administrator stated that an individual will gain access to his video and photo content that is updated weekly and is not available in the free area, and that as a VIP member, an individual would also gain access to content in the VIP-private area that other members have uploaded.

---

[2] ".rar." files, or container files, are similar to .zip files and are used to compress and deliver numerous files in a single folder called a container. WinZip is a commonly used program for creating and opening such files.

27. In or about May 2012, the Administrator restricted access to the Board.  The Administrator
    explained on the Board that due to the rapid growth of the Board, there would no longer be
    new free access (or "easy registration" as he called it) to the Board and all new membership
    would be vetted through the Administrator.  Prior to that change the Board was growing
    consistently at a rate of approximately five new members per hour.  The Board has a
    significant number of members, including the Board Administrator, who claims to be a
    producer of visual depictions of minors engaged in sexually explicit conduct.    The
    Administrator sells videos for 30 to 60 Euros (roughly 35 to 75 USD).  The Administrator
    claims he is the producer of the videos, and states on the Board that "the money received
    from you is needed just for a living to provide for the family and to give the girls a decent
    support. It is also for the video recording management and equipment."  To date more than
    30 child sexual abuse and exploitation victims in the United States and abroad have been
    identified.  Many other children have been determined to be "new material" – *i.e.*, images
    that had not been previously seen by law enforcement – and have not yet been identified.

### Finding and Accessing "Bulletin Board A"

28. "Bulletin Board A" operates on a computer network [hereinafter "the Network"] available to
    Internet users that is designed to facilitate anonymous communication over the Internet.  In
    order to access that Network, a user must install computer software that is publicly available,
    either by downloading software to the user's existing web browser, downloading free
    software available from the network's administrators, or downloading a publicly-available
    third-party application.  Using the Network prevents someone attempting to monitor an
    Internet connection from learning what sites a user visits and prevents the sites the user visits
    from learning the user's physical location.  Because of the way the Network routes

19

communications through other computers, traditional IP identification techniques are not viable.

29. Websites which are accessible only to users within the Network can also be set up within the Network. "Bulletin Board A" is one such website. Accordingly, "Bulletin Board A" cannot be accessed from the traditional Internet. Only a user who has installed the appropriate software on the user's computer can access the Board. Even after connecting to the Network, however, a user must know the exact web address of such a website in order to access it. Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user cannot simply perform a Google search for the name of "Bulletin Board A," obtain the web address for the Board, and click on a link to navigate to the Board. A user might obtain the web address for "Bulletin Board A" directly from other users of the Board, or from Internet postings describing the sort of content available on "Bulletin Board A" as well as its location. Accessing "Bulletin Board A" therefore requires numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble upon "Bulletin Board A" without first understanding its content and that its primary purpose is to advertise and distribute child pornography.

## FACTUAL BACKGROUND

30. While HSI conducted an undercover investigation of "Bulletin Board A," information relating to members of "Bulletin Board A" was downloaded and captured. Utilizing this information, HSI Special Agents captured information related to a member using the screen name **Jean7285**. Included on the Board's profile for **jean7285** were the following statistics:

    a. Member joined the bulletin Board on **December 25, 2011**.

    b. Member accessed the Board as recently as **April 23, 2013**.

  c. Member supplied the email address, **jean7285@hotmail.com,** during member registration.

31. Law enforcement has monitored "Bulletin Board A" and utilizing a tool to observe how frequently members are logged onto "Bulletin Board A," **jean7285** was observed as logged onto "Bulletin Board A" **216** times since starting the use of this tool in May of 2012 through April of 2013.

32. Law enforcement captured several postings made by **jean7285** on "Bulletin Board A," including the following:

  **a.** On **February 9, 2012**, **jean7285** posted to a thread titled Moscow 45 Part11. **Jean7285** posted: "I can't open the files the pass don't work." The video file that **jean7285** was attempting to download was titled: "two girls fingering, dildo, anal, face sitting, pussy and ass fisting, blowjob, face***, swallow."

33. As a result of information obtained from the undercover investigation, HSI Special Agents were able to identify e-mail addresses associated with specific members of "Bulletin Board A" and to investigate these e-mail addresses to identify IP logs associated with these accounts.

34. Law enforcement identified the member **jean7285** logging onto the Board using the following associated e-mail address:

  a) Jean7285@hotmail.com

35. An administrative subpoena/summons was served to Microsoft requesting information related to the above e-mail address. On or about March 27, 2013, Microsoft provided the following relevant information:

Accountholder: Jean Paul Jimenez

Registration IP address: 216.124.207.221

IP Log History: 97.91.232.108 on February 17, 2013 through March 24, 2013

Length of Service: From September 28, 2001 to the present date

36. Using publicly available websites, HSI Special Agents were able to determine that the above IP Address was operated by the Internet Service Provider (ISP) Charter Communications.

37. An administrative subpoena/summons was served to Charter Communications requesting information related to the member who was assigned to the above IP address. According to the information received from Charter Communications, Lindsay McCartney is receiving Internet service at the address of the SUBJECT PREMISES with an installation date of March 28, 2012. Internet service was current as of April 15, 2013 at the aforementioned premises.

38. Investigation has revealed that McCartney once dated another male that is believed to be living with Jimenez at 1 Old Orchard Lane in Glen Carbon, Illinois.

39. On April 14, 2013, representatives of the Glen Carbon, Illinois, Post Office indicated that Jean Paul Jimenez receives mail at the SUBJECT PREMISES.

40. On April 14, 2013, representatives of the Glen Carbon, Illinois, Public Works Department indicated that the water account for the SUBJECT PREMISES is registered to Jose Jimenez and has been since 2007.

41. On or about April 14, 2013, agents began surveillance of the SUBJECT PREMISES. The residence located at 1 Old Orchard Lane in Glen Carbon, Illinois, within the Southern District of Illinois, is more fully described as a townhouse duplex. The townhouse located at

22

1 Old Orchard Lane is the townhouse on the south side of the duplex. The townhouse is brown brick and tan siding and has a brown shingle roof. There is an attached two car garage which faces west. The white front door faces west as well. There is a green mailbox with the number 1 located at the end of the driveway. At the back of the residence there is a sliding glass door which leads out to a small deck with stairs leading to the backyard.

42. A search of Accurint information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) was conducted for Jimenez. These public records indicated that Jimenez' current address is 1 Old Orchard Lane, Glen Carbon, Illinois, 62034, within the Southern District of Illinois.

43. On May 22, 2013, representatives of the Glen Carbon, Illinois, Post Office confirmed that Jean Paul Jimenez continues to receive mail at the SUBJECT PREMISES.

44. Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize web based bulletin boards to access with intent to view and/or collect, receive, distribute or advertise images of child pornography:

    a. Individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

23

b.  Individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.  Individuals who access with intent to view and/or collect, receive, distribute or advertise] child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.  Likewise, individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

24

e. Individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. Individuals who would have knowledge on how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g. Individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

a. Based on the following, I believe that Jimenez displays characteristics common to individuals who access with intent to view and/or collect, receive, distribute or advertise child pornography because, *inter alia*, he became a became a member of "Bulletin Board A," the primary purpose of which is to advertise and distribute child pornography.

25

## **CONCLUSION**

45. Based on the above information, there is probable cause to believe that violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, have occurred, and that property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment A of this Affidavit, are located at the SUBJECT PREMISES. I therefore request authority to search and seize such material.

46. Based upon the foregoing, I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing the search and seizure of the items described in Attachment A.

47. It is further respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES). Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

**FURTHER AFFIANT SAYETH NAUGHT.**

Special Agent John Taylor
U.S. Department of Homeland Security
Homeland Security Investigations (HSI)

STEPHEN R. WIGGINGTON
United States Attorney

ANGELA SCOTT
Assistant United States Attorney

State of Illinois        )
                         ) SS
County of St. Clair      )

SWORN to before me, and subscribed in my presence on the 22nd day of May, 2013, at East St. Louis, Illinois.

DONALD G. WILKERSON
United States Magistrate Judge

27

## ATTACHMENT A
## ITEMS TO BE SEARCHED FOR AND SEIZED

1. Instrumentalities of the aforementioned violations contained within the affidavit for the search warrant at the SUBJECT PREMISES in any form wherever it may be stored or found including, but not limited to:

   a. any computer, computer system and related peripherals, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, graphic interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such graphic interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to, computer hardware, software, diskettes, backup tapes, CD-ROMS, DVD, flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals;

   b. books and magazines containing visual or written depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. 2256;

   c. originals, copies, and negatives of visual or written depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. 2256; and

   d. motion pictures, films, videos, and other recordings of visual or written depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. 2256;

2. Information or correspondence pertaining to the violation of Title 18, United States Code, Sections 2251, 2252 and 2252A, that were transmitted or received using a computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

   a. envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. 2256; and

   b. books, ledgers, and records bearing on the production;

   c. reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including

28

by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. 2256;

3. Credit card information including but not limited to bills and payment records,

4. Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and

5. Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for internet access, and handwritten notes,

6. Information or correspondence pertaining to affiliation with any child exploitation bulletin boards and/or child exploitation chat forums,

7. Any child pornography as defined by 18 U.S.C. § 2256,

8. Any material that is "child erotica,"

9. Any correspondence or records indicating the true identity of any member of "Bulletin Board A,"

10. Any correspondence or other recording, including e-mail and electronic messages pertaining to "Bulletin Board A."